THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOSEPH PIETRYZK, Defendant-Appellant.
First District (2nd Division) No. 85—0855

Opinion filed March 10, 1987.

James J. Doherty, Public Defender, of Chicago (Alison J. Norwood, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Lynn M. Egan, and Michael J. Marovich, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Defendant-appellant Joseph Pietryzk was charged by information with the offense of murder, arising from the death of George Cushman in 1983. Following a jury trial, defendant was convicted of that charge and sentenced to an extended term of 50 years' incarceration. He appeals, and we now reverse.

On review, defendant raises five issues. First, he contends that the circuit court erred in denying his motion to suppress his statements as the fruits of an allegedly illegal arrest. Next, he asserts that the court improperly denied his tendered jury instructions on the included offense of voluntary manslaughter based on a sudden and intense passion. He also claims that error occurred when the court permitted the State to introduce his four oral statements into evidence but denied his attempt to introduce the final written statement obtained by the police. Defendant next maintains that the court erred in refusing to admit into evidence decedent's prior convictions. Finally, he claims that he was denied a fair trial when the State allegedly introduced hearsay testimony bearing on his character. We address these issues *seriatim*.

George Cushman was killed in the early morning hours of Decem-

ber 14, 1983. Cushman, like defendant, was a transient who often stayed in abandoned buildings for shelter. The killing herein occurred in an abandoned building.

Decedent's sister, Jerri Crocker, testified that a month prior to her brother's death she had heard defendant threaten to kill him. Robert Norton, a friend of the decedent, stated that on November 14, 1983, defendant came to the abandoned building in which Cushman was living and destroyed a radio belonging to Cushman. Ronald Faltin, the bartender at a tavern frequented by both decedent and defendant, testified that in early December 1983, while he was at work, he had seen defendant "pester" Cushman for money. On that occasion, when defendant moved to strike Cushman, Faltin interceded and ejected defendant from the tavern. At that time, defendant allegedly told Cushman, "I'll get you when that punk ain't there."

At the time Cushman was killed, he was staying at 4558 South Paulina in Chicago. As noted, that was an abandoned building. On the evening of December 13, Cushman met Norton at the Ankle Inn Tavern. At that time, Cushman was carrying a suitcase. Sometime thereafter, defendant entered the bar and began "eying" Cushman, according to Norton. Defendant also spoke to an individual at the bar identified only as Billy. Norton overheard Billy ask defendant "when he was going to take care of it," and defendant told Billy that he could not do it in the bar. When defendant left the bar, he told Norton to "watch out for George." This warning was repeated later that night when defendant briefly returned to the bar. Norton and Cushman left the tavern at about 1:30 in the morning of December 14, and separated shortly thereafter.

Crocker testified that in the early morning hours of December 14, defendant, Cushman, and a third man came to her home and woke her up. Crocker refused to open the door or let Cushman spend the night there, stating that she had heard that defendant had "killed three men before."

Cushman's body was found later at the abandoned building he used for lodging. His death was caused by severe head trauma, inflicted by a blunt instrument which broke through his skull and removed part of the bone and part of his brain. He was found slouched on a couch, with blood splattering on his arm and jacket. His pockets had been pulled out. There was also blood on a wall of the room. No knife was found at the scene. It was also established that at the time of his death, decedent had a blood alcohol level of .215%.

The next day, Norton spoke to two of Cushman's relatives, Patrick Huff and Steven Aviles. After Aviles called the morgue and

found out that Cushman had been killed, Huff called the police. Detective O'Connor responded to the call, and the three men informed him of the threats and arguments that had occurred between decedent and defendant. O'Connor was also told of the buildings defendant frequented, including the one that decedent used on the night of the killing.

Aviles told O'Connor that he was familiar with the area, and he offered to help O'Connor and his partner, Detective McCann, locate defendant. The officers accepted that invitation.

Aviles led them to several locations, and finally took them to an abandoned building at 5001 South Ashland. They arrived there at about 3 p.m. Aviles knocked on the door while the officers waited on the sidewalk. Aviles backed up from the door, looked up toward an open window and called for defendant. Defendant answered, and then came down to the door. He opened the door, took a step outside, and when he saw the police officers attempted to flee. The officers grabbed him just inside the door and placed him under arrest. Defendant was then taken to the station. Defendant claimed that Aviles called to him, asked him a question, and then asked him to come downstairs. When he opened the door, defendant claimed the officers stuck a gun in his face and arrested him.

A total of five statements were elicited from defendant while he was in custody, the first four of which were oral. Initially, defendant claimed that he was not at decedent's apartment at the time of the murder, but rather was out with a man he identified as Joe Contreras. The police spoke to Contreras, and then confronted defendant again. Defendant then gave a second statement, this time admitting that he was with decedent, but stating that when he went to the bathroom three Mexicans entered the building, demanded money from Cushman, and then killed him by beating him with a board. After reinspecting the scene, the police told defendant that they did not believe him. In his third statement, defendant clung to the "three Mexicans" story. In his fourth oral statement, defendant admitted striking Cushman with a board, but asserted that he did so only after he heard Cushman pull out and open a knife. The written statement comported with the last oral statement, except that defendant claimed to have seen the knife.

At trial, defendant testified that Cushman pulled a knife on him and provoked a fight, and that he initially used a two-by-four to ward off decedent, later striking Cushman to protect himself. Defendant also said he disposed of the knife. As noted earlier, the court denied defendant's motion to suppress his statements, allowed the oral state-

ments into evidence but denied admission of the written statement, and refused defendant's tendered voluntary manslaughter/sudden and intense passion instructions. The jury convicted him of murder, and this appeal followed.

We first address defendant's contention that the circuit court erred in denying his motion to quash his arrest and suppress his statements on fourth amendment grounds (U.S. Cons., amend. IV). The basis of defendant's argument is the method by which the police effectuated his arrest: the police had Aviles, whom the accused knew, ask him to come outside while the officers allegedly secreted themselves from view. When defendant opened the door, the officers emerged, chased him as he fled into the building, and then arrested him on the staircase. This "subterfuge and trickery" assertedly deprived the arrest of constitutional validity, since it was without a warrant and defendant was not allegedly "in public" at the time.

■■ ■ Absent exigent circumstances, the police may not effectuate a warrantless, nonconsensual entry of a private residence to make an arrest. (*Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371; *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543.) In determining whether exigent circumstances exist, the following factors are relevant: (a) the gravity of the offense; (b) the existence of probable cause; (c) the existence of a strong reason to believe the suspect is present; (d) the likelihood of escape; and (e) whether the officers' entry was peaceable. (*People v. Yates* (1983), 98 Ill. 2d 502, 456 N.E.2d 1369, *cert. denied sub nom. Williams v. Illinois* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364.) It has been noted that these factors are only guidelines, and that the final determination turns on the overall reasonableness of the police action in light of what was known to them at the time of the arrest. (*People v. Yates* (1983), 98 Ill. 2d 502, 456 N.E.2d 1369.) We believe that the police action herein met the test of reasonableness and that, accordingly, the circuit court did not err in denying defendant's motion.

■■ The United States Supreme Court in *Payton* emphasized that the fourth amendment's protections drew a "firm line" at the doorway to the home. In analyzing the application of that decision made in a hotel hallway, this court stated in *People v. Blount* (1981), 101 Ill. App. 3d 443, 446, 428 N.E.2d 621:

"Defendant's reliance on *Payton* is misplaced, because *** the arrest did not take place in defendant's home. *** Defendant's arrest physically took place in the hotel corridor outside rather than inside defendant's room. A hotel corridor is no more a constitutionally protected area than a hallway situated

in an apartment building."
Similarly, the location of the arrest herein was not a "private place" within the purview of constitutional protection. Rather, it was a staircase within an abandoned building, apparently the staircase leading towards the vacant upstairs apartments. Defendant admitted that he was not a tenant of the building, and that he had spent the night in the hallway. It would thus appear that defendant was in a "public place" before the police and Aviles even reached the building, much like the accused in *Blount*. It necessarily follows that defendant's reliance on *Payton*, like that of the accused in *Blount*, is misdirected.

■ Even if it were held that defendant had a reasonable expectation of privacy in the hallway of an abandoned building, reversal would not be proper for other reasons. In *People v. Cobb* (1983), 97 Ill. 2d 465, 486-87, 455 N.E.2d 31, the Illinois Supreme Court noted that there was nothing in the constitution or in the criminal code which required policemen to announce their office prior to entering a dwelling to make an arrest that is otherwise authorized. That being so, it follows that the constitution does not compel the police to reveal their presence to the object of their quest before the individual can see them. In this regard, we note that one of the relevant concerns in analyzing the propriety of a warrantless entry is the likelihood of escape. That likelihood would be magnified if the police conduct herein were to be penalized.

■ Finally as to this argument, it is noted that there were ample facts to support a finding of probable cause. Probable cause exists when the information known to the arresting officer would warrant a person of reasonable caution to believe that a crime had been committed and that the accused was the offender. In making this determination, courts are not disposed to be unduly technical. (*People v. Sargent* (1985), 139 Ill. App. 3d 488, 491, 487 N.E.2d 1002.) The circuit court found probable cause to exist based on these facts: defendant lived in the same building as decedent, the body was found there, defendant was the last person seen with Cushman, he had threatened Cushman shortly before Cushman was killed, defendant held a grudge against decedent, and defendant fled immediately upon seeing the police. These facts were sufficient to establish probable cause. The entry was therefore warranted under *Yates*, as the offense was serious (a homicide), probable cause existed, there was reason to believe defendant was present, the entry was peaceable, and given defendant's transient lifestyle there was reason to act expeditiously.

■ Defendant next asserts that the court erred in refusing to instruct the jury on the included offense of voluntary manslaughter

based on a sudden and intense passion. The Criminal Code of 1961 defines that offense as follows:

"A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) the individual killed * * *

* * *

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(a).)

Defendant tendered instructions on this offense. In refusing those instructions, the court stated:

"I do not believe that the facts match the A section here [sudden and intense passion]; which is, of course, the test. The defendant's testimony was in contrast to actions done in intense passion.

The defendant's testimony was quite reasoned. He stated that he picked up the two-by-four; that he swung it, in an attempt to either scare the decedent, or have him drop the knife."

We believe the court's decision was in error.

The State concedes that an accused is entitled to have the jury instructed on any offense disclosed by the evidence adduced at trial, even if that offense is based on facts inconsistent with defendant's trial testimony. (*People v. Bratcher* (1976), 63 Ill. 2d 534, 540-41, 349 N.E.2d 31.) Absent such instructions, the jury lacks the tools needed to analyze fully the evidence and reach a verdict based on those facts. (See *People v. March* (1981), 95 Ill. App. 3d 46, 419 N.E.2d 1212.) The State maintains that in this case the instructions were unnecessary, as the evidence was inconsistent with a sudden and intense passion. The State is correct insofar as it asserts that there must be some evidence in the record to support a verdict; were the rule otherwise, the instruction itself would be surplusage. In the case *sub judice*, there was sufficient evidence to support the tendered instruction.

The recognized bases upon which intense passion may arise are substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse. Mere words or gestures or trespass to property are insufficient. (*People v. Fausz* (1983), 95 Ill. 2d 535, 449 N.E.2d 78.) Where there is some evidence of these facts in the record which, if believed by a jury, would

reduce the crime to manslaughter, then a tendered manslaughter instruction must be given. (*People v. Leonard* (1980), 83 Ill. 2d 411, 420-21, 415 N.E.2d 358.) This threshold is fairly minimal, and "all that need be shown is the slightest amount of evidence regarding the underlying theory." *People v. Sykes* (1977), 45 Ill. App. 3d 674, 678, 359 N.E.2d 897.

At trial, defendant relied on his own testimony to provide the necessary evidentiary basis for the instruction. He stated that when he and Cushman were together in an abandoned building, he saw Cushman pull out a knife. Cushman asked defendant if he still wanted to fight. Defendant declined, and picked up a piece of wood to protect himself. Cushman stood up, and defendant used the wood "like a baseball bat" to try to either ward off Cushman or cause him to drop the knife. When Cushman persisted and came towards him, defendant hit him with the wood several times. These blows proved fatal. Defendant described himself as scared, in panic and in shock. Other than the two men, no one else was present.

■■ If believed by the jury, this evidence would have been sufficient to justify a verdict on voluntary manslaughter. This testimony established more than mere "fighting words," rather it established that decedent was armed, threatened defendant, and may have been the aggressor. Given the minimal threshold for the instruction, we believe that the circuit court erred in refusing to so instruct the jury.

This result is in harmony with other reported cases addressing the question of the propriety of instructions on lesser included offenses. For example, in *People v. Young* (1976), 37 Ill. App. 3d 199, 345 N.E.2d 722, the court reversed a murder conviction and remanded the case for a new trial where the trial court denied instructions on the offense of voluntary manslaughter/unreasonable belief in self-defense. The appellate court based its finding on the fact that the parties had been drinking, that decedent came towards defendant armed with a two-by-four, the fact that the pathologist stated that the victim was facing defendant, and the fact that defendant fired a warning shot before killing the victim. This was sufficient, if believed by the jury, to reduce the degree of the conviction, and required the instructions tendered by defendant. This is analogous to the instant case, in that Cushman was intoxicated, defendant testified that Cushman threatened him and came toward him with a knife even as defendant tried to "ward him off" by swinging the two-by-four. If credited by the jury, this testimony could produce a sudden and intense passion and reduce the degree of the offense.

Similarly, in *People v. Leonard* (1980), 83 Ill. 2d 411, 420-22, 415

N.E.2d 358, the court reversed a murder conviction because of the failure to give tendered instructions on voluntary manslaughter/sudden and intense passion. In that case, the court stated:

> "Defendant correctly contends that mutual combat has been recognized in Illinois as adequate provocation, sufficient to reduce the offense to voluntary manslaughter. [Citation.] As we stated in *People v. Handley* (1972), 51 Ill. 2d 229, 235, 'It is well settled that if there is evidence in the record which, if believed by a jury, would reduce the crime to manslaughter, a manslaughter instruction tendered by defendant must be given.'
>
> In the present case there is evidence that defendant entered the premises and in a threatening manner demanded entry ***. There is also evidence that defendant suffered a lacerated lip and that decedent suffered lacerations to the head and right hand. *** Subsequent to the circumstances which produced these injuries, defendant and decedent were engaged in a struggle over a weapon. ***
>
> * * *
>
> *** We believe that the evidence in the present case presents some evidence of mutual combat and that the State's argument concerning the adequacy of provocation under these circumstances should be addressed by the jury. We hold that the trial court should have tendered an instruction on the lesser included offense of voluntary manslaughter ***."

The struggle in *Leonard* was precipitated by the accused, whereas, according to defendant, herein decedent initiated it. The case at bar is as compelling for the tendered instructions on the included offense as was *Leonard*.

Finally as to this issue, the court's comments in refusing the instruction reflect both the court's evaluation of the worth of defendant's testimony and the court's conclusion that since he was urging self-defense he could not pursue a conflicting theory. This analysis is improper. In reversing a murder conviction in *People v. Brooks* (1985), 130 Ill. App. 3d 747, 751, 474 N.E.2d 1287, the court stated: "[T]he credibility of the witnesses can only be resolved by the jury, not by the trial court. [Citation.] Defendant was entitled to his theory of defense even if the trial judge believed that the evidence *** was of doubtful credibility." The court also rejected the argument that because defendant testified that the gun went off accidentally, he could not request an instruction based on self-defense.

The same result obtains herein. That defendant argued self-de-

fense does not preclude a finding of intense passion. Although no knife was found, defendant explained that he disposed of it. The facts herein would arguably support a jury finding of sudden and intense passion, and defendant was entitled to have the jury so instructed. Accordingly, we must reverse his conviction and remand the cause for a new trial.

In light of our determination of the instructions issue, we need not address all of the remaining issues. We confine our comments herein to those issues likely to recur on retrial.

■■ Defendant asserts that the court erred in refusing to allow him to produce his written statement, in which he admitted killing decedent but claimed that he did so after seeing decedent pull out a knife. When the court so ruled, it had already admitted four oral statements obtained from defendant.

Defendant's argument on this point is actually a marriage of several theories. He maintains both that admission was mandated by the "completeness doctrine," and as a prior consistent statement. We believe that defendant is correct on the latter point.

The completeness doctrine permits a party to introduce the balance of an utterance or writing in order to explain, qualify or otherwise shed light on that portion of a statement introduced by an opponent. In essence, it allows a party to place a statement in context, so as to afford the jury the means to make an informed assessment of its import. (*Lawson v. G.D. Searle & Co.* (1976), 64 Ill. 2d 543, 356 N.E.2d 779.) Under the doctrine, admission of the remainder of the statement turns on its relevance and materiality. "[T]he remainder of the conversation or statement to be admitted must concern ' "what was said on the *same subject at the same time* ***" ' [in order to be admissible]." (Emphasis in original.) *People v. Cowper* (1986), 145 Ill. App. 3d 1074, 1080.

■■ Here, although the written statement was taken within hours of the last oral statement and concerned defendant's actions on the night of the murder, it was not contemporaneous with the subject conversation. *Cowper* presented similar circumstances: defendant's statement at the police station was introduced and he sought the admission of an earlier statement made at the time of the arrest under the completeness doctrine. The court held that statement beyond the ambit of the completeness doctrine because it did not alter the context of what was said at the police station. By comparison herein, it is notable that in the last oral statement defendant alleged that he struck decedent because he heard a knife, whereas in his written statement he asserted that he saw a knife. This statement did not

"shed light" on the meaning of the oral statements, rather, it contradicted them. As such, the completeness doctrine is inapplicable.

 The court's refusal must still be measured by the argument that the written statement was a prior consistent statement. Defendant testified on his own behalf and claimed that he saw a knife in Cushman's hands, that Cushman came towards him, that he used the wood to protect himself and ultimately struck the fatal blows. This version was inconsistent with all four oral statements, a fact repeatedly emphasized by the State in its summations. The State argued to the jury that defendant began the interrogation with an outright lie, and each time he was confronted thereafter added a little truth to the succeeding version:

> "What did he tell Detective O'Connor, and Detective Palmer? 'I heard a knife.' And that is because it was too dark in the apartment; you could not see anything.
>
> By the time he got up here on the witness stand, it was a red Swiss knife, with a corkscrew.
> * * *
> He did not see a corkscrew on a Swiss knife. That is preposterous. He is just trying to fool somebody on this jury.
> * * *
> That is the same man who said he was with Joe Contreras. That is the same man who said the three Mexicans came in the door. Those stories belong in the garbage, and so does the self-defense story.
> * * *
> And we are describing the knife, for the first time, in court.
> ***
> * * *
> And, in his own statement, ladies and gentlemen, when he said 'I thought I heard the knife,' he is admitting—he is admitting that he could not see what was in the victim's hand."

What is clear from the State's summation is that defendant's prior statements were used as inconsistent statements undermining his credibility. Since defendant's veracity was impugned, and it was argued that he made up the story about seeing the knife for the first time when he testified before the jury, he should have been permitted to introduce his written statement to rebut the inference of recent fabrication. (See *People v. Hicks* (1963), 28 Ill. 2d 457, 463, 192 N.E.2d 891.) On retrial, the written statement should be admitted.

 Defendant's attempt to introduce Cushman's prior criminal record was properly denied. The two convictions dated from 1958 and

1964. These were simply too remote in time to provide any affirmative insight into decedent's mental state or violent tendency.

For the above stated reasons, the judgment of the circuit court of Cook County is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

STAMOS and BILANDIC, JJ., concur.