2021 IL App (1st) 190665

FIRST DISTRICT
SIXTH DIVISION
March 12, 2021

No. 1-19-0665

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 10 CR 9341 02 |
| | ) | |
| HERIBERTO VIRAMONTES, | ) | Honorable |
| | ) | Jorge Luis Alonso, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSITCE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice Connors concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, defendant Heriberto Viramontes was convicted of multiple felonies, including armed robbery and attempted murder, for striking Stacy Jurich and Natasha McShane with a bat and robbing them. His convictions and sentences were affirmed in *People v. Viramontes*, 2017 IL App (1st) 142085, and the supreme court denied his petition for leave to appeal. Defendant filed three *pro se* postconviction petitions (hereafter collectively referred to as the "petition"), which the circuit court summarily dismissed. On appeal, defendant contends that the dismissal was error where his petition stated a meritorious claim that he was denied effective assistance of trial counsel. He alleged that counsel failed to utilize the completeness doctrine to admit the entirety of his recorded conversations, which would have given his statements context and supported his theory that he was misidentified as the offender. For the following reasons, we affirm.

¶ 2                                    I. JURISDICTION

¶ 3      The circuit court dismissed defendant's postconviction petition on May 18, 2018. This court allowed the filing of a late notice of appeal, which defendant filed on April 11, 2019. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 651 (eff. Feb. 6, 2013), governing appeals in postconviction proceedings.

¶ 4                                    II. BACKGROUND

¶ 5      The following facts, taken in part from *Viramontes*, 2017 IL App (1st) 142085, are relevant to this appeal.

¶ 6      Defendant was charged by indictment with two counts of attempted first degree murder, two counts of armed robbery, one count of armed violence, two counts of aggravated unlawful restraint, eight counts of aggravated battery, two counts of unlawful restraint, four counts of misuse of a credit card, and two counts of use of a credit card by another. Defendant was charged along with codefendant Marcy Cruz. The charges arose out of an incident that occurred on April 23, 2010, in which Natasha McShane and Stacy Jurich were robbed of their purses and other items after being struck on the head with a baseball bat. Prior to trial, Cruz pled guilty to two counts of attempted first degree murder and received a sentence of 22 years' imprisonment. In exchange for her guilty plea, she agreed to testify against defendant.

¶ 7      At trial, Cruz testified that on April 23, 2010, at around 11:30 p.m., she went to a bar located at Division and Campbell in Chicago with her friend, Honey. Defendant, whom Cruz knew as "Betto," met her at the bar, and they left together in Cruz's grey minivan. After having sex in the van, they drove around the Bucktown neighborhood. Defendant stated, "[l]ook at all these

white hoes," and mentioned he wanted to rob one of them. He parked the van and grabbed a bat from the back seat before exiting.

¶ 8　A few minutes later, defendant entered the side sliding door of the van with two purses and the bat. Cruz got into the driver's seat and drove down Milwaukee Avenue. She parked under the "el" after defendant told her to pull over. Defendant stated, "[t]he girls were really pretty and [I] did some bogus s***." He told her to look through the purses and "grab what [she] like[d]." Defendant took the credit cards and Cruz grabbed Dior perfume and makeup. They went to the BP gas station at Augusta and Western, where defendant told Cruz they would pump gas, use the credit card, and then keep the money. At the gas station, defendant exited the car with the credit cards. Cruz saw him throw some of the robbery proceeds into a garbage can.

¶ 9　Cruz identified both herself and defendant in the BP gas station surveillance video. She indicated in the video where defendant instructed her to put in a zip code for the credit card. When they were unable to run the transaction, they left to pick up Kira Lundgren, defendant's pregnant girlfriend. Before Lundgren got into the van, defendant told Cruz not to say anything to her about the robbery.

¶ 10　Cruz, Lundgren, and defendant eventually left a second gas station and went to the west side of Chicago. Defendant parked in an alley, left for an hour, and returned holding some televisions. They dropped Lundgren off at home and then Cruz and defendant went to Cruz's house, where they dropped off the televisions. Defendant told Cruz that if anybody asked, she should say she got the purse from a "crack head." He also gave her a Blackberry cell phone from one of the purses.

¶ 11　Two days later, on April 25, 2010, defendant gave Cruz a "script" to say she got the purse from a "crack head," and he also told her to throw away the cell phone. The next day, the police

placed her under arrest, and she gave them her consent to search the van. Cruz identified People's Exhibit 181, a compact disk of a series of five audio telephone calls. She further identified defendant's voice in all the calls. Cruz testified that she pled guilty to two counts of attempted first degree murder in this case in exchange for a 22-year sentence. She admitted that she had bipolar disorder, anxiety, and depression for at least 10 years and that, in April 2010, she was not taking medication for these conditions. She testified that she self-medicated with marijuana.

¶ 12    Cruz acknowledged on cross-examination that she gave the police a different story than what she testified to in court. She admitted telling the police a story defendant wanted her to tell, which involved meeting a young black male named Jamaica who sold her two purses for $80. She also acknowledged that she told police in a second statement that when defendant came back to the van, she did not see him with the bat. She only saw him place something up his sleeve. Cruz never told police or the assistant state's attorneys that she saw defendant throw items in the garbage can at the BP gas station. She admitted to signing a nine-page handwritten statement, which stated that she did not see defendant with a bat.

¶ 13    On redirect examination, Cruz testified that when she went to the second gas station with defendant and Lundgren, she was alone with Lundgren at one point. She then told Lundgren defendant had robbed some girls.

¶ 14    Stacy Jurich testified that in 2010, she was living in the Bucktown neighborhood in Chicago, Illinois. She met Natasha McShane that same year, after McShane moved to Chicago from Ireland. On April 22, 2010, Jurich made plans to meet McShane for dinner after work. They met at 9 p.m. at Cans, a restaurant. McShane had with her a shopping bag from H&M, a purse, and her class materials. Jurich also had a purse. Later, they walked across the street to the Tavern restaurant, where they had cocktails and danced.

¶ 15    They left the Tavern restaurant around 3 a.m. and started walking toward Jurich's house. As they continued north on Damen Avenue, they walked underneath a viaduct and Jurich was hit in the head from behind. She felt excruciating pain, lost her equilibrium, and suddenly tasted metal in her mouth. As she fell forward, Jurich caught herself and looked to her left. She saw McShane being hit in the head with a silver baseball bat. McShane fell down immediately and appeared lifeless on the sidewalk. Jurich was then hit a second time in her neck, and her purse was taken while the robber called her a "stupid b***." After her purse was pulled from her arm, Jurich saw a man in a hoodie running away with her purse and McShane's belongings.

¶ 16    After the assailant fled, Jurich tried to support McShane's head, which was bleeding. She waved down a taxi and begged the driver to call 911. When the paramedics arrived, Jurich was disoriented and felt severe pain and nausea. As she spoke with police, she felt weak as if she would pass out. She could not remember anything after that point, except that she was in an ambulance and then she was in a bright room with people shouting her name. When she woke up in the Intensive Care Unit (ICU), her body felt like it was "filled with sand" and she could not move her left side. The back of Jurich's skull had been cracked open, and it had to be stapled shut at the hospital. She experienced seizures at the hospital, and upon her discharge, she was not permitted to drive. Jurich testified that she has lost her peripheral vision, continues to have balance issues, and experiences excruciating headaches.

¶ 17    A few days after being admitted to the hospital, Jurich spoke with the police and informed them that her initial description of the assailant's race was incorrect, that his skin was medium brown and not black. She also identified the items McShane had in her possession the night of the attack.

¶ 18     Shelia McShane testified that her daughter Natasha had returned to Ireland, and due to her brain injury, she could not travel to Chicago to testify. Mrs. McShane cares for her daughter five days a week and Natasha's father, Liam McShane, cares for her the other two days. On April 24, 2010, she received a telephone call from Chicago that her daughter was in the hospital and they needed to come immediately. At the time, her daughter had only been in Chicago for four months, having arrived in January 2010 to complete her master's degree in Urban Environmental Planning at the University of Illinois Chicago. Mrs. McShane had last seen Natasha in January 2010, when she drove her to the airport to move to Chicago.

¶ 19     Mrs. McShane testified that, prior to her injuries, Natasha was a very outgoing, energetic, artistic person who was full of life and who loved to travel. When she and Mr. McShane arrived in Chicago, they went directly to Illinois Masonic Hospital, where their daughter lay unconscious. Her hair had been partially shaved off as a result of the surgery needed to relieve pressure on her brain. Her eyes were swollen and blackened. She remained unconscious for the entire three weeks they stayed in Chicago. In July 2010, Natasha returned to Ireland via air ambulance.

¶ 20     Mrs. McShane testified that after Natasha returned to Ireland, she experienced a seizure that left her catatonic and in a wheelchair. Prior to the seizure, she had been making slow progress, but the seizure set her back significantly. Natasha also had an infection after surgery and experienced a second seizure that resulted in a hip fracture. At the time of trial, she could not read, write, or talk, and she remained mostly wheelchair-bound.

¶ 21     Dr. Marius Katilius, an expert in the field of trauma surgery, treated both Jurich and McShane at Illinois Masonic Hospital. Jurich had an actively bleeding scalp laceration, and he stopped the bleeding with a suture. Prior to leaving the emergency room, Jurich had seizures, which Dr. Katilius opined were trauma-related. He diagnosed Jurich with a traumatic brain injury caused

by blunt force trauma. He stated that being hit with a baseball bat was consistent with the injuries she sustained.

¶ 22    McShane arrived at Illinois Masonic Hospital at 4 a.m., and after an examination, Dr. Katilius inserted a breathing tube in her windpipe. McShane had a skull fracture of the right temporal and parietal bones, hemorrhagic contusions, a subarachnoid hemorrhage, and a subdural hematoma. He opined that her injuries were consistent with being hit with a baseball bat.

¶ 23    Dr. Leonard Irwin Kranzler, an expert in neurosurgery, treated Jurich and McShane on April 23, 2010, at Illinois Masonic Hospital. He learned from McShane's CAT scan that she had a traumatic subarachnoid hemorrhage, as well as a cerebral contusion. He recommended monitoring the pressure in her skull. When he first examined McShane, he saw the pressure in her skull was not elevated but her brain was swollen. When her pupils dilated, indicating the efforts to control the swelling were failing, Dr. Kranzler performed emergency surgery to alleviate the pressure on her brain. He removed a large area of her skull and the tip of the temporal lobe of her brain. After the surgery, a CAT scan revealed McShane had suffered a stroke with possible vision loss. Dr. Kranzler opined that her injuries were consistent with blunt force trauma and being hit with a baseball bat. He further opined that the fracture on her skull required "considerable force."

¶ 24    Commander Joseph Salemme testified that, on April 23, 2010, he learned of an investigation regarding an attack at 1800 N. Damen Avenue. Commander Salemme joined the investigation and focused mainly on obtaining Jurich's and McShane's cellular phone information, as well as their bank records and credit card information. On April 25, 2010, he learned about information regarding Jurich's cell phone and went to 3149 N. Springfield Avenue in Chicago, which was a 20-unit apartment building. As he and other police officers canvassed the building, Commander Salemme met Marcy Cruz. He subsequently learned that Jurich's cell phone had been

used to call a phone number registered to Josue Espinoza, Cruz's boyfriend. He returned to 3149 N. Springfield Avenue, where he saw Cruz walking towards a grey van. She was placed under arrest, and her van was impounded. Later, police recovered a baseball bat with silver duct tape from the rear of the van. On April 26, 2010, Commander Salemme assisted in locating defendant and Kira Lundgren at 2715 West Evergreen Avenue. Defendant was placed under arrest and Commander Salemme interviewed Lundgren.

¶ 25    Chicago police detective Seamus Fergus testified that on April 25, 2010, he received an assignment to investigate an incident at 1800 N. Damen Avenue. He learned of fraudulent credit card charges at Comcast and of several transactions at a BP gas station at Augusta Boulevard and Western Avenue. He went to the gas station and reviewed surveillance footage from several cameras. At 3:48 a.m. on April 23, 2010, the video showed one male and one female, with the male subject walking back and forth to the gas station attendant. He took a large item out of the van, which looked like a jacket or shirt "filled with something." Detective Fergus searched each of the nearby garbage cans, as well as the main dumpster where he found a red binder, McShane's Irish passport, a certificate of eligibility issued to McShane, a black day-planner, and an H&M bag. Later, Detective Fergus went to Lundgren's house at 2715 W. Evergreen Avenue and took defendant into custody.

¶ 26    Kira Lundgren testified that in 2010, she had known defendant for about a year and was pregnant with his child. She called defendant "Betto." Lundgren also knew Marcy Cruz, who was a friend of defendant and drove a van. In the early morning hours of April 23, 2010, defendant woke her up, and they got into Cruz's van. Lundgren noticed that defendant seemed agitated. They stopped at a gas station, and defendant got out of the van and started talking to gas station

customers. Defendant had a credit card in his hand. After leaving the gas station they drove around, but at some point, the van broke down. They received a jump start from an African American man.

¶ 27    Lundgren testified that, after the jump start, she went home. She left Cruz and defendant in the van. Later that day, she saw defendant and Cruz at Cruz's apartment, where Cruz showed her some "high end" concealer that she "had come up on." She noticed Cruz and defendant reading a newspaper. On April 26, 2010, at around 11:30 p.m., she was at home with defendant when the police came to her apartment to take defendant into custody. She consented to a search of her apartment.

¶ 28    Prior to testifying, Lundgren listened to People's Exhibit 181, a CD with five audio phone calls, and recognized defendant's voice on all of the calls. She also identified her voice on one of the calls with the defendant. On April 26, 2010, she went to the police station and had a conversation with the police and an assistant state's attorney in which she relayed what she knew about the events on April 23, 2010.

¶ 29    Johnny Paige testified that he was presently in custody for felony theft and no promises were made in exchange for his testimony. He stated that on April 23, 2010, around 3:30 a.m., he and his wife were in a car parked in front of his house when a man approached and asked for help to jump start a minivan. The van was grey with a dent on the right front side. There were two women in the van. After Paige helped with the jump start, the man gave him two credit cards as payment and asked if he could count on Paige if he needed help in the future. The man dialed Paige's number and the man's number appeared on Paige's cell phone. Paige gave the credit cards to his sister.

¶ 30    On May 13, 2010, Paige went to the police station and identified defendant in a photo array as the person who asked for his help in jump starting the van. Paige also viewed a lineup in which he identified defendant as the person who needed a jump start.

¶ 31    Latoya Paige testified that her uncle is Johnny Paige and her aunt is Shirley Paige. On April 23, 2010, her Aunt Shirley came to her home with two credit cards. Latoya tried to pay her Comcast cable bill with one of the cards, but the payment did not go through. She then tried the other card and was successful in paying her bill. She stated that Jurich's name was on the card. On May 13, 2010, the police came to her home, and she viewed photo arrays in which she identified her Aunt Shirley and her Uncle Johnny.

¶ 32    Sergeant Steven Bouffard testified that he is a sergeant with the Cook County Sheriff's Office and oversees all operations of Securus, the inmate telephone system, inside the Cook County Jail. All the call details of each outgoing telephone call are recorded, including the location within the jail where it was made, the exact date and time of the call, the telephone number that was dialed, and what party terminated the call. The maximum length for one phone call is 15 minutes, and the system gives an automated warning when there is one minute left on the call. There is also a prompt, warning the called party that the call is subject to monitoring and recording. The prompt is repeated randomly throughout the call, up to four times per call. On May 9, 2010, May 20, 2010, June 5, 2010, and November 10, 2010, defendant was in custody at Cook County Jail and was housed in Division 9.

¶ 33    Sergeant Bouffard recognized People's Exhibit 181 as a CD containing audio recordings of five separate telephone calls on those dates recorded by the Securus system. Each call on the CD was a shortened version of a longer call. People's Exhibit 181 was published to the jury. The

details of each recording published to the jury will be set forth when we consider the merits of defendant's claims on appeal.

¶ 34    The parties stipulated that Investigator M. Delacey, from the Cook County State's Attorney's Office, would testify that on October 19, 2012, at around 1 p.m., he was present for an interview with Marcy Cruz, along with Assistant State's Attorneys Maher and Ogarek, in which Cruz stated that defendant told her "he robbed them" and that Cruz did not say defendant told her to throw away the Blackberry. He was also present for an interview of Cruz on October 19, 2012, in which she did not mention that defendant told her he robbed "them" or that defendant told her to throw away the Blackberry. Investigator Delacey also obtained a biological standard from defendant and Cruz by swabbing the insides of their mouths with a buccal swab.

¶ 35    The parties stipulated that if called to testify, officer George Martinez would state that, on April 30, 2010, he obtained biological standards from McShane and Jurich. He inventoried the buccal swabs, and a proper chain of custody was maintained at all times.

¶ 36    Chicago police officer Amy Campbell testified that, on April 23, 2010, she photographed the van and a baseball bat located inside the van. She placed the bat in a brown paper bag and inventoried it. Jaclyn Garfinkle, an expert in forensic DNA analysis, testified that she performed tests and determined that the bat contained a DNA mixture of at least three people, and defendant could not be excluded as a contributor. Michael Cox, an expert in latent fingerprint examination, testified that he examined the baseball bat for fingerprints and found no prints suitable for comparison. However, he found five latent prints suitable for comparison on the H&M bag and identified the prints as belonging to defendant.

¶ 37    Detective Rolando Rodriguez testified that, on April 27, 2010, he was present when Cruz gave her handwritten statement to Assistant State's Attorney Michelle Popielewski. Cruz made a

few corrections, including a correction on her statement that she did not see defendant take the baseball bat from her van "when he ran from the van to rob the white girls." On cross-examination, Detective Rodriguez testified he was present for an interview prior to Cruz providing a handwritten statement, in which she denied having any involvement in the crime. During an interview 20 minutes later, Cruz stated defendant took her boyfriend's bat from the van and put it up his sleeve before getting out.

¶ 38    Detective Robert Carillo testified that, on April 25, 2010, he interviewed Jurich at Illinois Masonic Hospital. She told him that the offender had a dark complexion and the baseball bat was silver. On April 26, 2010, Detective Carillo went to a gas station near Augusta and Western with Detective Fergus and they reviewed videos. He did not see anybody going to a large dumpster on the lot. On cross-examination, he testified that Jurich told him she originally thought the offender was black, but he may have been Hispanic.

¶ 39    Officer Elise Middleton testified that on April 23, 2010, she responded to a call and proceeded to 1800 North Damen Avenue in Chicago. She spoke with Jurich, who told her that the offender was a black male, approximately five foot seven to five foot nine inches in height, and medium build. On cross-examination, Officer Middleton stated that Jurich described the offender's skin tone as medium-brown, and he was wearing a light-colored hoodie. When she arrived on the scene, Jurich seemed dazed and had difficulty focusing and answering her questions. Jurich became light-headed and eventually lost consciousness.

¶ 40    After closing arguments, the jury deliberated for approximately three hours before returning guilty verdicts. Specifically, the jury found defendant guilty of attempted first degree murder of Jurich and McShane, guilty of armed robbery of Jurich and McShane, and guilty of

aggravated battery and aggravated battery causing permanent disability to both McShane and Jurich. Defendant filed a *pro se* post-trial motion requesting a new trial, which was denied.

¶ 41 At the sentencing hearing, the trial court imposed consecutive sentences of 25 years imprisonment for the attempted murder of Jurich and 25 years for the attempted murder of McShane. The court also imposed consecutive sentences of 20 years for the armed robbery of Jurich and 20 years for the armed robbery of McShane. The armed robbery convictions were to be served consecutively to the attempted murder convictions for a total of 90 years imprisonment. Defendant filed a motion to reconsider his sentence, which was denied.

¶ 42 On appeal, defendant raised three issues: (1) whether the State proved beyond a reasonable doubt defendant had the intent to kill both McShane and Jurich, (2) whether the trial court erred in admitting into evidence the five phone calls made from Cook County Jail, and (3) whether the trial court erred in limiting the disclosure of codefendant Cruz's mental health records. This court affirmed defendant's convictions and sentences, finding that based on the significance of the injuries inflicted upon Jurich and McShane, the facts sufficiently supported the jury's finding that defendant intended to kill them. We also found that a proper foundation had been laid for the admission of the five phone calls and that the trial court did not abuse its discretion in limiting the admission of Cruz's mental health records. See *Viramontes*, 2017 IL App (1st) 142085, ¶¶ 66-82. The supreme court denied defendant's petition for leave to appeal. *People v. Viramontes*, No. 121896 (Ill. May 24, 2017).

¶ 43 Defendant filed three *pro se* postconviction petitions. The circuit court considered all the petitions and allegations raised therein. Relevant to this appeal, one of defendant's claims was that his trial counsel provided ineffective assistance by failing to seek admission of the entire audio recordings pursuant to the completeness doctrine. Attached to two of the petitions was defendant's

affidavit, in which he stated that once he learned that the State would use portions of the phone call recordings, he "complained to counsel and told her the jury must hear the entire recording so they would understand the meaning of the conversations."

¶ 44    In its ruling, the circuit court stated that since it did not have the entire recordings or transcripts, it would consider the issue "as [defendant] represents it." The court found that "[m]ost of Viramontes' allegations do not truly implicate the completeness doctrine because the unadmitted portions of the conversations, even under his representation, would not in themselves give the context or meaning he claims is true. Rather, Viramontes offers alternative, innocent interpretations of what his statements meant." The court determined that what defendant claimed made the recordings misleading did not "derive from the recordings intrinsically," but from his interpretations of them, and that "evidence to corroborate what he says was his true meaning would have needed to come from some other source."

¶ 45    The circuit court also found that the admitted portions of the recordings "were somewhat ambiguous" because defendant's "statements were open to guilty and innocent interpretations. What to make of them was the jury's task." It determined that trial counsel did not perform unreasonably in failing to seek admission of the complete recordings, nor was defendant prejudiced as a result where "[e]ven without the phone calls the evidence was not closely balanced." Therefore, "[t]here is no reasonable probability that the trial would have resulted in an acquittal had the entire recordings been introduced." The court dismissed the petitions as frivolous and patently without merit. Defendant filed this appeal.

¶ 46                                    III. ANALYSIS

¶ 47    On appeal, defendant contends that the trial court erred in dismissing his petition for postconviction relief at the first stage. The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1

*et seq.* (West 2010)) provides a process in which a defendant can claim that his conviction was the result of a substantial denial of his rights under the United States Constitution or the Illinois Constitution or both. *People v. Cathey*, 2012 IL 111746, ¶ 17. The Act provides a three-stage process for nondeath penalty cases. *People v. Jones*, 213 Ill. 2d 498, 503 (2004). To survive summary dismissal at the first stage, defendant must present the gist of a constitutional claim. *Id.* at 504. The circuit court may summarily dismiss a postconviction petition at this stage if it is frivolous or patently without merit. *Cathey*, 2012 IL 111746, ¶ 17. Such a petition has "no arguable basis either in law or in fact," meaning it relies on "indisputably meritless" legal theories or "fanciful factual allegation[s]." *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). We review the circuit court's dismissal of a petition at the first stage *de novo*. *People v. Swamynathan*, 236 Ill. 2d 103, 113 (2010).

¶ 48    Since most postconviction petitions at this stage are drafted by *pro se* defendants, the threshold for survival to the second stage is low. *People v. Allen*, 2015 IL 113135, ¶ 24. The State contends that defendant did not meet this requirement where his affidavit contained only a "summation and interpretation of the jail audio recordings" he challenged in his petition. While a *pro se* petition is not expected to set forth a complete and detailed citation of the facts, it must set forth some objective facts that can be corroborated or contain an explanation as to why those facts are absent. *People v. Delton*, 227 Ill. 2d 247, 254-55 (2008). However, we are mindful that, at the first stage, the purpose of the affidavit is merely to establish that defendant's claims are capable of objective or independent corroboration. *Hodges*, 234 Ill. 2d at 10. We find that defendant's petition satisfied this low threshold, and thus proceed to the merits of his claim.

¶ 49    Defendant contends that the circuit court's dismissal of his petition was error where his petition stated a meritorious claim that he was denied effective assistance of counsel. Defendant

must overcome a strong presumption that, under the circumstances, the challenged action or inaction was sound trial strategy. *People v. Lopez*, 371 Ill. App. 3d 920, 929 (2007). Effective assistance of counsel refers to competent, not perfect, representation, and "matters relating to trial strategy are generally immune from claims of ineffective assistance of counsel." *Id.* To establish prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *People v. King*, 316 Ill. App. 3d 901, 913 (2000). At the first stage of postconviction proceedings, a petition alleging ineffective assistance may not be summarily dismissed if (1) it is arguable that counsel's performance fell below an objective standard of reasonableness and (2) it is arguable that the defendant was prejudiced. *Hodges*, 234 Ill. 2d at 17.

¶ 50   Defendant contends that his trial counsel was ineffective because she failed to utilize the completeness doctrine to admit the entirety of his recorded conversations. He contends that the State was allowed to publish portions of his recorded phone calls to the jury and the complete recordings would have given his statements context and supported his theory that he was misidentified as the offender. Defendant contends he was prejudiced by counsel's conduct because the State emphasized the select recorded statements in its closing argument to the jury.

¶ 51   "The completeness doctrine permits a party to introduce the balance of an utterance or writing in order to explain, qualify or otherwise shed light on that portion of a statement introduced by an opponent." *People v. Pietryzk*, 153 Ill. App. 3d 428, 438 (1987). Under the common law completeness doctrine, "the remainder of a writing, recording, or oral statement is admissible if necessary to prevent the trier of fact from being misled," to place the admitted portion in proper context so as to convey the correct and true meaning to the jury, or to shed light on the meaning of evidence already presented. *People v. Craigen*, 2013 IL App (2d) 111300, ¶ 45. However, "the

right to introduce an entire writing or conversation is not absolute." *People v. Moore*, 2012 IL App (1st) 100857, ¶ 48. "Rather, the doctrine of curative admissibility is limited in scope and design to those situations where its invocation is deemed necessary to eradicate undue prejudicial inferences which might otherwise ensue from the introduction of the original evidence." (Emphasis omitted.) *People v. Higgins*, 71 Ill. App. 3d 912, 931 (1979). There is no right to introduce portions of a statement that are unnecessary to the proper evaluation of the portions introduced by the State. *People v. Olinger*, 112 Ill. 2d 324, 337-38 (1986).

¶ 52    The following recordings were published to the jury. The first call was between Kira Lundgren (KL) and defendant (D):

"[D]: Who?

[KL]: *** Stacey Juricks [*sic*], the one that's not *** the one that's like, the one that was not in the coma.

[D]: Oh yeah.

[KL]: Yeah.

[D]: She's okay.

[KL]: She's been released. Am um she's going home right now. And they're uh *** I mean she's still physical therapy or whatever. They held like a fundraiser for her. I guess they raised a lot of money. And then there's gonna be one for the other one, for Natasha, there's going to be one in the next month for her.

[KL]: For a fundraiser for medical bills.

[D]: Oh.

[KL]: Yeah. But apparently they're doing better, I mean they haven't backslid or anything so that's really good.

[D]: [crying] I wish I could talk to them. I wish I could talk to them.

[KL]: Yeah.

[D]: Tell them that I … That I'm sorry."

The second call was between two males, one whom both Lundgren and Cruz identified as defendant:

"[D]: No, they're going to charge me with aggravated battery, aggravated robbery, whatever.

[MALE]: I know but I'm saying when you went to court they didn't say none of that s*** so why are they gonna add it on now?

[D]: Why? Because she came out of the coma, she's doing better so they were hoping she dies. That's what they were doing. They were hoping she dies. But now that she didn't die, they're like f***k, we can't charge him with a f***ing aggravated battery, aggravated robbery and attempt murder—I mean murder so we'll just charge him with armed robbery and attempted. But at the same time my intention—they can't charge me with attempted murder so they gotta break that down for the simple is my intentions was not to kill nobody or attempt to kill nobody. My intentions was to get money and get high. Get money and help out

Marcy. That's my intention. So therefore they cannot charge me with attempted murder. Armed robbery, okay fine. Armed robbery, let's go. Let's get it. You know what I'm saying? This is just dirty right now."

The third published call was between a male and a female, and both Lundgren and Cruz identified the male voice as defendant:

"[D]: Are you like checking up on these girls or not?

[FEMALE]: They're still alive hun, the one is at home, the other had her benefit yesterday.

[D]: Yeah downtown.

[FEMALE]: Yeah. I mean she didn't go but the family you know? I don't understand how that could be a charge.

[D]: Yeah first degree attempt

[FEMALE]: I just don't understand that because it wasn't attempted.

[D]: Yeah, I know. The only thing, the goal was f***ing, just get money to help Marcy, that was it.

[FEMALE]: What?

[D]: My goal was to get money to help Marcy.

***

[D]: Get money to help Marcy pay her f***ing rent and her f***ing TV out the laptop, I mean out the f***ing pawn shop ***"

The fourth telephone call was between two males, and Lundgren and Cruz both identified one of the male voices as defendant's:

"[D]: I wrote a letter to Marcy, I wrote a letter to Marcy. You want me to say everything on the phone? I wrote a letter to Marcy saying, 'cause you don't give a f*** I'm not going to give a f***, you remember why, you tell your son why. Cause your dumb a*** don't know when to f***ing talk and don't know when to not talk.' I wrote a letter to Marcy because I need a f***ing statement saying something other than what she said. Yeah there's things in there that I said that probably don't sound right or probably didn't, for the simple fact cause, and some s*** she did. The reason why I wrote the s*** is because I didn't want her … I didn't want her to show baby rascal like 'hey look this n*** wrote me, boom. This what he said woo woo what you think I should do?' I wanted her to react on her own instead of getting someone else.

[MALE]: That's her mother***ing man, that's her man. Her baby daddy. She supposed to show him.

[D]: *** Anyways like I said. I need her to give me a f***ing statement. That's her man? If that's her man, then why the f*** is she going out tricking with other n***s—"

The fifth call was also between two males, one of whom Lundgren and Cruz identified as defendant, in pertinent part:

> "[D]: I already told hey a***, man that ain't s***. It's just…. Okay I… I don't know what I did. I was high. I did some stupid s***. But it wasn't like that you know what I'm saying? Like the way mother f***ers making it seem. I'm beating mother***ers up side the head with bats and s*** . nah. I probably hit her once, then hit the other b*** once, took her s***. That's it but not hard, not to kill 'em not to hurt 'em. You know what I'm saying? But man, it is what it is. I'ma be here for a minute or so ***"

¶ 53     We address only those statements defendant challenges on appeal. See Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) ("[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

¶ 54     In the conversation where defendant is confronted with letters he wrote to Cruz, defendant stated that he needed Cruz to give a "statement saying something other than what she said." Defendant contends that he was not trying to get Cruz to change her statements to help him, as the State argued, and the rest of his conversation was needed to give it proper meaning. In his affidavit, defendant stated that the remainder of the recording would show that he said, "Kira you're going to leave me. You don't care about me, whether or not I get life in prison. Well know this. Yes, I wrote love letters to Marcy. They meant nothing." Defendant argues that these statements would show that he wanted "Marcy to give up the truth, in her handwriting, that would point to who she was with when they committed the crime." He wanted her "to come clean."

¶ 55    Defendant acknowledges that he wanted Cruz to change her statement, which is what the recording showed. Nothing about the unpublished statements place the admitted portion in proper context or shed light on the meaning of evidence already presented. See *Craigen*, 2013 IL App (2d) 111300, ¶ 45. As the court below noted, testimony external to the recording was required to give his words their claimed meaning. Defendant's argument is essentially a disagreement with an interpretation of the published portion of the recording, not that the statement misled the jury. The published statement itself "must actually be misleading" for the completeness doctrine to apply. *People v. Caffey*, 205 Ill. 2d 52, 91 (2001).

¶ 56    Next, defendant challenges the published call in which he asks a female about the condition of the victims. Defendant contends that the State used this conversation to argue that he was hoping they had died so it would be his word against Cruz. Defendant stated in his affidavit that if the entire recording had been played, the jury "would have understood what was being said: [defendant] needed the two girls to get better so they can come and testify to what they saw." As support, defendant points out that, in a different recording, he allegedly told Lundgren to pray for the victims "so they can come in and testify on the person who did this to them." Again, the published statements of defendant asking about the condition of Jurich and McShane were not misleading. Defendant merely attributes another meaning to his words that requires other evidence, in the form of a different conversation that took place at a different time, to support it. For the completeness doctrine to apply, the statement to be admitted must concern " ' "what was said on the *same subject at the same time*." ' " (Emphasis in original.) *People v. Cowper*, 145 Ill. App. 3d 1074, 1080 (1986). Furthermore, as the circuit court noted, interpretation of the evidence is within the particular province of the jury which courts generally "refrain from invading." *People v. Ware*, 2019 IL App (1st) 160989, ¶ 49.

¶ 57    The final statements challenged on appeal are those in which defendant talks about hitting the victims on the head with a baseball bat. He contends that the entire recording would show that he did not commit the offense, but instead was talking about how "crazy" it was for the State to say that Jurich and McShane got hit four or five times with a bat. According to his affidavit, defendant said in the unpublished portion, "I could understand if they said I hit them once or twice s\*\*\*, if that. But once I'd understand. But 4 or 5 times is crazy." He alleged that he also stated, "I'm not denying I had the bag and cards. I'm saying I did not do this s\*\*\*." Defendant argues that from these unpublished statements, the jury would have understood that "he acquired these items after Jurich and McShane were assaulted and that he was not responsible for the attack."

¶ 58    Even as set forth by defendant, however, those statements do not support his claim that the published portion misled the jury into thinking that he attacked the victims. In the context of the entire conversation, his alleged statement that he "did not do this s\*\*\*" more likely referred to the State's "crazy" argument that he hit the victims four or five times with the bat, rather than just once or twice. This interpretation also corroborates defendant's published statement that he only hit the victims once. As such, the recording was not misleading.

¶ 59    Furthermore, if we interpret defendant's unpublished statements to mean that he did not hit the victims at all, these words clearly contradict what the jury heard in the published statements. In the recording, defendant acknowledged that he hit each of the victims once, but "not hard," before taking their property. The completeness doctrine does not apply if the additional portions "merely contradicted" defendant's published statement. See *Pietryzk*, 153 Ill. App. 3d at 438-39.

¶ 60    Since the completeness doctrine is inapplicable to defendant's arguments, counsel was not ineffective for failing to raise it at trial. Defendant also was not prejudiced by counsel's conduct. As the circuit court found, even without the recordings, the evidence in the case was not closely

balanced, as there was other testimonial and physical evidence linking defendant to the crime. We also disagree with defendant's contention that the State relied on the phone calls in its closing argument. The prosecutor's closing argument spanned approximately 20 pages of record, with mention of the recordings taking up less than one page. Accordingly, since defendant failed to make an arguable constitutional claim that counsel's performance fell below an objective standard of reasonableness, or that he was prejudiced by counsel's performance, dismissal of his petition at the first stage of postconviction proceedings was proper. See *People v. Brown*, 2017 IL App (1st) 150203, ¶ 31.

¶ 61                                    IV. CONCLUSION

¶ 62     For the reasons stated above, we affirm the dismissal of defendant's postconviction petitions.

¶ 63     Affirmed.

---

**No. 1-19-0665**

---

| | |
|---|---|
| **Cite as:** | *People v. Viramontes*, 2021 IL App (1st) 190665 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 10-CR-9341(02); the Hon. Jorge Luis Alonso, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Tiffany Boye Green, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Matthew Connors, and Iris G. Ferosie, Assistant State's Attorneys, of counsel), for the People. |

---