2022 IL App (1st) 190225-U

SECOND DIVISION
May 24, 2022

No. 1-19-0225

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 13 CR 15781 |
| | ) | |
| WILLIE WOODS, | ) | |
| | ) | Honorable Mary Margaret Brosnahan, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

ORDER

¶ 1    *Held*: We affirm the judgment of the trial court. We find that the trial court did not abuse its discretion when it denied defendant's motion for a continuance; when it prohibited defendant from introducing a self-serving telephone recording in which he denied being the killer; when it denied defendant's request for a second-degree murder jury instruction; and we find that defendant is not entitled to relief under the plain error doctrine based on comments the prosecutor made during closing arguments.

¶ 2    Defendant Willie Woods was tried by a jury and convicted for the first-degree murder of Dominique Green. On appeal, he argues the trial court erred when it denied his motion for a continuance to secure the testimony of a witness. Defendant also argues the trial court erred

when it barred him from introducing a recording of a telephone call that he made from jail in response to the State's introduction of other telephone call recordings. Defendant also argues the trial court erred when it refused to instruct the jury on second-degree murder. Lastly, defendant argues he was denied a fair trial because the jury expressed that they were afraid of him and his associates and because the State made prejudicial comments during its closing argument that played on the jury's fears. Finding no reversible error, we affirm.

¶ 3                                  BACKGROUND

¶ 4      On August 1, 2012, Dominique Green was shot 10 times. He died at the scene of the shooting. One bullet entered between his eyes, one entered his left eye, and one entered in the back of his scalp. He was also shot twice in the left arm, and one of the bullets entered, exited, and reentered his left forearm in a manner that was consistent with the victim holding his hand up to defend himself. Green was also shot in the chest, shoulder, side, groin, and pelvis. All of the bullets were fired from the same weapon and shell casings were recovered from the scene by investigators.

¶ 5      In a police report created the night of the shooting, officers indicated that they spoke to Daviond Dalton. Dalton, who was a minor at the time, reportedly told police that he saw people arguing, heard gunshots, and then saw a man with braided hair holding a gun and fleeing. When police attempted to talk to Dalton a week later, Dalton's mother informed the officers that Dalton would not talk to them. Dalton gave no further statements to police and was not brought before the grand jury. Defense counsel issued a subpoena for Dalton at his address in Illinois a few weeks before trial, but he no longer lived at that address. One week before trial, a process server served Dalton with the subpoena at his new residence in Indiana. Defense counsel spoke to Dalton on the phone after he was served, but Dalton indicated that he would not be coming to

court. Dalton gave the phone to his mother who told defense counsel that Dalton did not remember anything and that he would have to be arrested before he would come to testify. The State indicated that it had been unable to serve Dalton with a subpoena but reported that Dalton had called the prosecutor to indicate that he would not come to court.

¶ 6     The day before the trial was set to begin, defense counsel requested a continuance to secure Dalton as a defense witness. The State had previously requested a continuance to secure the presence of Darian Broomfield as a witness and the State had located Broomfield, so it was ready to proceed. Defense counsel indicated that the presence of Broomfield at trial would affect the defense strategy and indicated that the defense was not ready for trial without Dalton's presence, despite previously answering ready for trial. The trial court questioned defense counsel about the importance of Dalton as a witness since the defense had not listed him as a witness and had not even mentioned him to the court until right before trial. Defense counsel had previously told the court that she did not intend to call any witnesses other than those listed in the State's discovery and counsel filed a written answer making the same assertion.

¶ 7     Defense counsel informed the court that even if the court issued a warrant for Dalton, it would not be valid for Indiana without counsel filing motions in Indiana, which would require more time. The trial court stated that it might be willing to delay jury selection for three days if counsel had a lead on securing Dalton as a witness before jury selection started. The trial court denied the motion. Defense counsel did not file anything else with the court related to securing Dalton as a witness before trial.

¶ 8     During jury selection, there were discussions about gangs and about whether the jurors could be fair and impartial upon hearing evidence about gangs and gang membership. At least three jurors shared, in the presence of the other potential jurors, personal experiences of being

affected by gang violence. Those potential jurors were excused. A handful of other potential jurors shared, in chambers, experiences that made them unable or unwilling to sit on the jury in this case. Those potential jurors were also excused. A jury was subsequently empaneled, and the trial was set to proceed the following day.

¶ 9 Before the trial began the following morning, a deputy reported to the court that one of the jurors was having a panic attack and was indicating that he would not be able to sit as a juror on the case because of the nature of the case and the gang involvement. When the court questioned the juror in chambers, the juror indicated that he thought he could handle being a juror on the case but realized that he now wanted nothing to do with the case because it was gang related and because the defendant now knew the juror's name. The juror recounted that other people in the jury room had expressed that they wished they were only listed as a number instead of by name, because now the defendant would know who they are. The juror, however, indicated that he did not share his fears about the gang-related nature of the case with anyone else on the jury. The trial court excused this juror and replaced him with an alternate juror.

¶ 10 The trial began, and the State began calling its witnesses. During a recess on the first day of testimony, defense counsel again brought up Daviond Dalton to the court and stated that he was an important witness. Defense counsel explained that it would be impossible for the defense to go through the necessary procedures in Indiana to try to force Dalton to come to court before the end of trial. The trial court expressed its willingness to issue a warrant for Dalton if he was timely served and he still did not appear. There is no indication in the record that defense counsel ever filed anything in Indiana or took any further steps to secure Dalton's presence once the trial began.

¶ 11     The trial continued with the State calling its witnesses. After testimony concluded on the first day of trial, the deputy reported to the court that one of the jurors indicated that she recognized someone in the gallery. The juror was brought into chambers and indicated that she was "a little scared" by the idea that the jury could convict the defendant and that the person she knew in the gallery could recognize her. The person the juror recognized in the gallery was someone she believed she had encountered in her prior employment. The trial court asked the juror if there was anything else making her feel fearful aside from possibly recognizing someone in the gallery, and the juror responded, "the trial. I think everyone is uncomfortable with that." The juror denied hearing anything about the male juror that was excused that morning or hearing him talk about the case. She indicated that the excused juror just "kind of walked out. I don't know what happened to him."

¶ 12     The deputy indicated that jurors had spoken to him about their names being used in court. The deputy reported that jurors expressed that they were uneasy about their names being used in open court because anyone could just Google their names. Defense counsel spoke to the woman in the gallery whom the juror thought might recognize her. Defense counsel confirmed that the woman in the gallery worked in the capacity described by the juror, but the woman in the gallery indicated that she did not know any of the jurors. The trial judge instructed the juror to return the following day and to not mention the issue to her fellow jurors.

¶ 13     The following morning, the trial judge called the juror from the night before back into chambers. The juror expressed that her address was easy to find online and that she did not want her face to be out there. The trial judge asked the juror if anyone in the jury room was saying anything to make her think those things and the juror responded in the negative and stated that "this is me putting scenarios in my head." The juror expressed concern about being recognized

and noted that "we are talking about gang shootings here." When the juror returned to the jury room, she was crying. Both the prosecution and the defense agreed that the juror should be excused. She was called back into chambers. The juror told the court that she did not say anything to the other jurors about her concerns about the nature of the case or tell the other jurors what was going on. The trial court excused this juror and replaced her with the second alternate.

¶ 14    At trial, Ladarius Norris testified that the victim, Dominique Green, was his best friend. Ladarius testified that he was driving when he saw Green standing on the corner of Independence and Lexington. Ladarius stopped to talk to Green and talked to him briefly before walking across the street to take a phone call. Ladarius heard gunshots and saw a black man holding a red or orange shirt over his head as he shot Green. Ladarius testified that the shooter was shorter than himself, even though he had previously told investigators that the shooter was tall. Ladarius described the weapon as being silver with an extended magazine on it. Ladarius did not see Green with a weapon.

¶ 15    On cross-examination, Ladarius testified that defendant was not the shooter because the shooter's build was littler, and the shooter's skin was lighter than defendant's skin. Ladarius testified that he never told police that defendant was the shooter, but instead testified that the police were the ones that told him that defendant was the shooter. Ladarius testified that Dariel Birdsong was one of the people in the area of the shooting and that Birdsong had dreadlocks while defendant did not have dreadlocks. Ladarius testified that his brother, Robert Norris, who would subsequently testify, was not present at the time of the shooting.

¶ 16    Robert Norris, Ladarius's brother who was also known as "Dolie," testified. His testimony at trial contradicted the statements he gave to detectives, the video statement he gave to the state's attorney, and his grand jury testimony. Dolie testified that the victim was a friend

and that he had known the victim his whole life. Dolie testified that he had known defendant for about 10 years because the two of them grew up in the same neighborhood. Dolie testified that he was not present in the area of the shooting, but that he spoke to detectives about the shooting after he was arrested for an unrelated matter 10 days later. Dolie testified that he told the detectives he was not there, but the detectives told him that they would help him with his case if he identified defendant as the shooter in this case. He testified that the detective gave him statements to say and that they rehearsed the statements. Dolie admitted that he identified defendant in a statement to detectives, in a video statement in the presence of an assistant state's attorney, and in grand jury testimony.

¶ 17 In his statement to investigators Dolie stated that defendant killed Green, who was also known as "Snoop." Dolie stated that he was at Lexington and Lawndale with several other people when defendant and Green started fighting about who could sell cannabis on the block. Dolie stated that defendant went into an alley, reemerged, and hit Green in the face with a handgun before returning to the alley. Dolie stated that defendant emerged from the alley again with his orange t-shirt covering his face and ran up behind Green, grabbed him and turned him around, and then shot him about eight times. Dolie saw defendant get into the backseat of a waiting SUV and Dolie himself then got into the SUV too. Defendant told Dolie that "it was either [defendant] or Snoopy." Defendant threw his shirt out of the vehicle's window and gave the firearm to the driver. Dolie described the weapon as a silver and black Baretta with a 30-round magazine.

¶ 18 The prosecution played Dolie's video statement for the jury and introduced his grand jury testimony, which were substantially the same. An assistant state's attorney testified that Dolie told her before giving his grand jury testimony that he was not threatened or promised anything

for his testimony. Dolie testified before the grand jury that he was not threatened or promised anything for his testimony, and he made the same statement in his video-recorded interview with detectives.

¶ 19    Dolie testified before the grand jury that defendant and the victim belonged to different gangs. Dolie stated that the two gangs got along with one another and that they all sold drugs near Lexington and Lawndale. Defendant and Green, however, had a dispute about drug territory. Dolie testified that he was with his brother, defendant, and others at Lexington and Central Park when they received a phone call and were alerted that Green was "spazzing out" and that they needed to go calm him down. When they arrived at Green's location, Dolie and Green spoke about selling cannabis until defendant stepped in. Defendant and Green started arguing and then started fistfighting. Dolie broke up the fight, but defendant and Green exchanged more words and then defendant left and went into the nearby alley. Dolie and Green started walking away until defendant reemerged from the alley holding a silver and black gun. Defendant hit Green in the face with the gun. Defendant returned to the alley after hitting Green, but then came back from the alley 30 seconds later with his orange shirt wrapped around his face and head. Dolie was certain it was defendant and recognized defendant's outfit.

¶ 20    Dolie testified to the grand jury that defendant grabbed Green from behind. When Green turned around, defendant yelled at him and pointed the gun at him. Green was unarmed, shielding his face with his hands, and said, "are you gonna kill me?" Dolie then watched defendant shoot Green in the face. Green fell down and defendant stood over him and "finished him off" with 10 more gunshots. Dolie testified that he knew and never had any doubts that it was defendant who shot and killed Green.

¶ 21    Dolie told the grand jury that he and defendant got into the waiting red SUV. Defendant still had the gun with him. Defendant threw his orange shirt onto the expressway. Defendant asked the other occupants of the car if anyone had seen him, and Dolie replied, "you just killed [Green] in front of the whole neighborhood." Defendant said "it was either him or me," despite Dolie's awareness that Green was unarmed. Defendant gave the gun to the driver of the SUV and Dolie heard that defendant later sold the gun. Dolie further testified to the grand jury that he was at Harding Park the next day when defendant arrived. Dolie heard defendant make a statement confirming that he killed Green. At trial, Dolie admitted he made some of the statements to detectives and the grand jury and he denied that he made other statements, but he testified that he was implicating defendant in this case "to save his [own] neck" in his own criminal case.

¶ 22    On cross-examination, Dolie confirmed that he was arrested in an unrelated manner and was facing an extended prison sentence. When he was arrested, Dolie had a gun with an extended magazine, a dreadlock wig, and a police scanner. Dolie testified that he received the minimum sentence in his own case in exchange for implicating defendant. The parties stipulated that the assistant state's attorney who handled Dolie's case would testify that Dolie's plea deal had nothing to do with his cooperation in this case. The parties also stipulated that a firearm forensics expert would testify that all of the bullets fired in Green's murder were fired from the same weapon and that none of the bullets were fired from the weapon found when Dolie was arrested. Dolie testified to the grand jury that neither his testimony to them nor his prior recorded statements were the result of any threats or promises.

¶ 23    Darian Broomfield testified that he learned Dominique Green was killed on the day that it occurred, but that he did not know who killed Green. Broomfield denied that he was in Harding Park the day after the shooting and denied that he saw defendant in the park that day. Broomfield

testified that he was arrested on an unrelated matter and detectives told him that they would release him from custody if he made a statement implicating defendant in Green's murder. Broomfield admitted that he previously made a statement implicating defendant and that he testified to the same before a grand jury about the matter.

¶ 24 The State introduced Broomfield's statement and his grand jury testimony, which were substantially the same. Before the grand jury, Broomfield testified that he was at Harding Park the day after the murder when defendant arrived in a red or maroon SUV. Defendant had a 9-millimeter handgun with an extended magazine in his waistband and stated that "I took care of that bitch Snoop." Broomfield understood the statement as an admission that defendant killed Green. Broomfield told the grand jury that he did not originally tell the police what he heard and saw in the park that day because he was afraid defendant might kill him. Broomfield testified, however, that he felt safer at the time the grand jury was convened because defendant was in custody. Broomfield stated both in his statement to detectives and in his grand jury testimony that his statements were voluntary and were not the result of any threats or promises.

¶ 25 Broomfield told the grand jury he heard defendant make a statement about wanting to kill a rival drug dealer for whom Green reportedly worked, saying that "he is next." Broomfield stated that his testimony was not the result of any threats or promises.

¶ 26 On cross-examination, Broomfield testified that he implicated defendant because he was promised that his own drug charges would be dismissed. He reiterated that detectives coached him on what to say in his statement implicating defendant in Green's murder and that he was trying to do everything in his power to help himself. A retired assistant state's attorney testified that he interviewed Broomfield and that Broomfield agreed to testify before the grand jury. The retired ASA testified that no deals were made with Broomfield for his statement or his grand jury

testimony. The retired ASA testified that he told Broomfield that no deals would be made for his testimony and that Broomfield never indicated that detectives coached him or told him what to say.

¶ 27    Jeffrey Gaddis testified that he was sitting on the back porch of a second-floor apartment at Lexington and Independence. Gaddis saw two men arguing across the street. A red SUV stopped near the arguing men and a man who was not wearing a shirt got out of the SUV. One of the men who was previously arguing ran west and the man without a shirt followed him. Gaddis lost sight of the men and then he heard gunshots. The shirtless man reappeared and got back into the SUV, which sped off. Gaddis never saw the shirtless man's face and did not see the actual shooting.

¶ 28    Detective Juan Carlos Morales testified that he and Detective Arthur Taraszkiewicz were assigned to investigate Green's murder. They spoke to Dolie and he informed them that defendant was the killer. Morales testified that he did not coach, threaten, or promise Dolie anything for his statement or subsequent grand jury testimony. Morales testified that he and Taraszkiewicz also spoke with Broomfield who told them about defendant's statement in the park in which defendant admitted to killing Green. Morales testified that he did not coach, threaten or promise Broomfield anything for his statement or subsequent grand jury testimony.

¶ 29    Morales confirmed that Taraszkiewicz spoke to Daviond Dalton after the shooting. Morales tried to interview Dalton himself, but Dalton's mother would not allow the interview, which was her right since Dalton was a minor. Morales testified that they had not concluded that the shooter had dreadlocks based on Dalton's statement and were not looking for someone with a particular hairstyle during the investigation.

¶ 30    The State introduced three recordings of phone calls that defendant made from jail. The defense objected to the admission of the phone calls, but the court ruled that the statements reflected defendant's awareness that Dolie implicated him and reflected defendant's efforts to dissuade witnesses from talking about the case.

¶ 31    In the first phone call, defendant instructed "tell that n*** don't say shit. If they ever catch him, don't say nothin'. What the fuck wrong with Dolie go in there tellin' these people everything [that] fucking happen detail by detail. *** Thought they [were] not gonna charge him with a banger or something *** If it weren't for him, I wouldn't be in motherfucking jail right now." In the second phone call a man said to defendant "I heard Dolie told on you" and defendant replied "that shit is on the streets already, huh." In the third phone call, the person asked defendant how he got booked and defendant replied "Dolie old ass, man. *** Dolie told 'em on me." When speaking about how he got arrested outside his girlfriend's place of employment, defendant stated "they was waiting. Dolie told [them] where she work at and everything."

¶ 32    As a result of the State being permitted to admit the telephone recording evidence, the defense sought to introduce recordings that the defense claimed contained statements of defendant denying involvement in the killing. The recordings contained statements such as "Dolie told on me on a body that I ain't even do." The trial court ruled that the statements would not be admitted because they did not constitute an exception to the hearsay rule. The court explained that if the defense could show that the State was somehow misusing the statements, it would entertain the argument about admitting the statements that defendant wanted to admit. The defense never made any further argument about the admission of the "exculpatory" recordings.

¶ 33    The parties rested on the evidence presented. Defense counsel requested that the jury be instructed on second-degree murder. The defense argued that the testimony about an argument and fight between defendant and Green and defendant's statement that "it was either him or me" warranted a second-degree murder instruction. The trial court rejected the defense's request to instruct the jury on second-degree murder, finding that there was not "even a scintilla" of evidence to warrant the issuance of the instruction.

¶ 34    During closing arguments, the State referenced the phone call recordings where defendant discussed how Dolie had implicated him. The State argued to the jury that defendant never said in those recordings that Dolie was lying or that his statements implicating defendant were wrong or inaccurate. However, there was a recording in which defendant claimed Dolie had lied on him, but that recording was not played for the jury. The State also discussed in its closing argument the fact that the witnesses were no longer cooperative once they were in the same room as defendant and implied that the witnesses were recanting their prior testimony because they were scared of defendant. The State further pointed out that other people mentioned during trial that might have been witnesses in this case were now deceased. According to defendant, the State insinuated to the jury that defendant might have been involved in the deaths of those people.

¶ 35    The jury found defendant guilty of first-degree murder. The jury also found that defendant personally discharged a firearm during the offense.

¶ 36    Defendant filed a posttrial motion raising three issues: (1) that the trial court erred when it denied his motion for a continuance to secure the testimony of Daviond Dalton; (2) that the trial court erred when it barred him from introducing the telephone recording in which he denied shooting Green; and (3) that the trial court erred by refusing to instruct the jury on second-degree

murder. The trial court denied the posttrial motion and subsequently sentenced defendant to 55 years in prison. On appeal, defendant raises the same three issues he raised in his posttrial motion, and he additionally argues that he was denied a fair trial because multiple jurors expressed specific fears about defendant and because the State played to those fears in its closing argument.

¶ 37                                    ANALYSIS

¶ 38    Defendant raises four issues on appeal. He argues that the trial court erred: (1) when it denied his motion for a continuance to secure the testimony of Daviond Dalton; (2) when it barred him from introducing the telephone recording in which he denied shooting Green; (3) when it refused to instruct the jury on second-degree murder; and he argues (4) that he was denied a fair trial because the jury expressed that they were afraid of him and his associates and the State made improper comments during its closing argument that played to the jury's fear.

¶ 39                    I. Defendant's Motion for a Continuance

¶ 40    Defendant argues that the trial court abused its discretion when it denied the oral motion he made for a continuance on the eve of trial. Defendant moved for the continuance in an effort to secure Daviond Dalton as a defense witness. Defendant argues that Dalton's testimony was important because Dalton told a detective after the shooting that the shooter had braided hair or dreadlocks. Defendant claims that he had short hair at the time of the shooting, but that Dariel Birdsong had dreadlocks and Dolie was arrested shortly after the shooting and was in possession of a dreadlock wig.

¶ 41    Defendant argues that he was prepared to go without Dalton as a witness because the State could not locate Darian Broomfield as a witness. However, defendant argues that once the State located Broomfield and secured him as a witness for trial, the defense strategy changed and

it needed Dalton's testimony. The State had located their witness and answered ready that day, and defense counsel answered not ready.

¶ 42    Defendant argues that the testimony of the State's newly found witness, Darian Broomfield, "change[d] the tenor of the case and made [Dalton] more critical." The trial court asked, "How so," noted that Dalton had never been mentioned to the court, and stated, "I find it very hard to grasp the fact that somebody who was not even going to be called the last time the case was up has somehow been transformed into this pivotal witness that you can't go without."

¶ 43    Defense counsel said she thought she had other witnesses who corroborated what Dalton saw, but in preparing for trial again, she noticed a discrepancy in reports and realized he was more critical. Counsel stated that she had tried to serve Dalton for months, but "only realized last week" he lived in Indiana. The defense served him there and made phone contact, and Dalton said he was not coming to court and gave the phone to his mother, who said he did not remember anything and was not coming to testify. The defense knew that the ASA's only contact with Dalton was prior to the last jury date: an investigator called Dalton and Dalton called the ASA's office, said he did not see anything, was not coming to court, and was not going to testify.

¶ 44    Defense counsel said her only source of information about Dalton's observations was a 2012 police report, and the court asked, "What's in this police report or GPR that would somehow make him pivotal? Does he identify? Does he say he knows the defendant and it wasn't him[?]" Defense counsel answered, "No," and said that, per the report, Dalton "saw the argument between the parties," "saw them walk away, heard shots," "saw the man with a gun fleeing," and "described that man with a gun as having braids." The court asked three times if Dalton saw the shooting, defense counsel answered, "no" each time, and the court stated, "So . . . never in your investigation of the case did he actually see the shooting itself," and counsel stated,

"That is correct." Counsel agreed there was no written statement or grand jury testimony and "no way to prove up any impeachment to be used as substantive evidence."

¶ 45    The trial court denied the continuance, set pre-trial motions and jury selection for the next day, and told counsel, "if between now and then you have a lead and you want to push it the day or two to three days to get this witness in you can and you can still be looking for him throughout the trial." Defense counsel noted that the court had no authority to issue a warrant for Dalton's arrest since the Illinois subpoena was not valid in Indiana, and stated, "we just realized this and haven't gone through the motions to do the materiality and all the things necessary."

¶ 46    Before jury selection began the next day, counsel inquired, and the court said it would consider a rule to show cause for Dalton.

> "And then again I would state that as much as the case has been on the call on a
> monthly basis and both sides have kept me up to date on the progress of the case,
> etc never has this individual been mentioned to the court as a possible witness or
> possible material witness paper witness, you know, etc, etc. That hadn't even been
> brought to me and here we are the day of trial. So again, that also factors into my
> finding. So we will hold it over till tomorrow."

¶ 47    Under the Code of Criminal Procedure, a written motion for a continuance made by a defendant may be granted when a material witness is unavailable and the defense would be prejudiced by the witness's absence from trial. 725 ILCS 5/114-4(b)(3) (West 2020). Whether the denial of a continuance for a witness was proper rests upon the facts and circumstances of the case and "particularly the reasons presented to the trial judge at the time the request is denied." *People v. Lott*, 66 Ill. 2d 290, 297 (1977). The factors to be considered when reviewing the court's decision are whether the defendant: (1) had shown that the testimony was material and

might have affected the jury's verdict; (2) was diligent in his attempt to secure the witness; and (3) was prejudiced by the denial of the continuance. *People v. McClain*, 343 Ill. App. 3d 1122, 1130 (2003). A court may also consider the history and complexity of the case, the seriousness of the charges, the length of the requested continuance, and judicial economy. *People v. Walker*, 232 Ill. 2d 113, 125 (2009). While the interest of judicial economy is important, it is more important that a defendant be given a full opportunity to present the facts bearing upon the question of guilt or innocence. *Lott*, 66 Ill. 2d at 297. The trial court has discretion in deciding whether to grant or deny a continuance, and a reviewing court will not interfere with the trial court's decision absent a clear abuse of discretion. *Walker*, 232 Ill. 2d at 127.

¶ 48 Given the information the trial court had at the time it denied the continuance, we cannot say no reasonable judge would have ruled the same way as the trial court did here. Therefore, we find no abuse of discretion. As an offer of proof in its posttrial motion, the defense relied on the information from the police report without any updated information from Dalton. Dalton did not see the shooting and stated he did not see who shot Green. Defendant admits that Daviond Dalton was listed in police reports created right after the shooting occurred. However, defendant made no documented efforts to locate Dalton or speak to him until a few weeks before trial. The trial court indicated to defendant that it would delay jury selection and delay the start of trial if defendant could secure Dalton as a witness. The trial court indicated that it would issue a warrant for Dalton if the defense took the required steps to compel his appearance. After the trial began, the defense provided no further information about efforts to secure Dalton's appearance.

¶ 49 Defendant argues that Dalton became such a necessary witness once the State located Broomfield and secured him as a witness for trial. However, nothing from Broomfield's testimony was tied to Dalton's statement. Broomfield only testified that he saw defendant in a

park the day after the shooting and heard defendant admit to killing Green. Defense counsel did not explain to the trial court, and defendant does not explain here, why Broomfield's testimony made Dalton's testimony all the sudden so important. The defense knew the State intended to call Broomfield as a witness and knew that the State was seeking to locate him for trial. The argument defendant makes is that he was gambling that the State would not locate Broomfield and was willing to go to trial without Dalton, but that once the State located Broomfield, he suddenly needed Dalton to mount a defense. That failed strategy was not a justification for delaying the trial.

¶ 50    At the posttrial hearing where defendant alleged the court erred in denying the continuance, the defense expressly elected to forego Dalton's testimony. Defendant argued that the length of the continuance would not have been unduly long because it would not have taken that long for counsel to file the paperwork in Indiana and secure Dalton's presence for trial.  The offer of proof from defendant about how Dalton could have helped the defense demonstrated that Dalton did not see the shooting. Dalton never told police that he saw the person that fired the gunshots. Detective Morales confirmed that Dalton told police he saw someone with braids with a gun after he heard gunshots, but Morales testified that the detectives were not looking for someone with a particular hairstyle after the shooting. Instead, Morales testified that he spoke to Green's family and learned he should speak to Dolie. After officers spoke to Dolie and otherwise investigated the case, they reached the conclusion that defendant was the shooter.

¶ 51    Based on the totality of the evidence offered in the case, even if Dalton testified consistent with his statement to police, it is not reasonably likely that his testimony would have affected the outcome of the case, therefore his testimony is not material. The pertinent inquiry with respect to materiality of an uncalled witness is not whether the evidence might have helped

18

the defense but whether it is reasonably likely that the evidence would have affected the outcome of the case. *People v. McLaurin*, 184 Ill. 2d 58, 89 (1998). Again, Dalton told detectives that he did not see the shooting take place and did not see who fired the shots that killed Green. On the other hand, there was substantive evidence admitted at trial that Dolie was with defendant on the day of the shooting and had known defendant for 10 years. Dolie watched defendant shoot Green in the face and then stand over him and shoot him several more times. Dolie got into an SUV with defendant after the shooting and heard defendant make inculpatory statements. Broomfield similarly heard defendant admit to killing Green. Defendant has not demonstrated any reasonable likelihood that the outcome of the case might have been different if his continuance would have been granted and Dalton gave his proffered testimony. We find no abuse of discretion.

¶ 52                                    II. Defendant's Phone Calls from Jail

¶ 53     Defendant argues that the trial court abused its discretion when it prohibited him from introducing a recording of a phone call he made from jail. In the recording at issue, defendant seemingly denied being the shooter; implied that Dolie was lying and that defendant was not responsible for the killing. Defendant contends that the trial court should have allowed him to introduce that recording after the court allowed the State to introduce three recordings that included damaging statements. Defendant argues that the court's error was particularly prejudicial once the State highlighted to the jury during its closing argument that defendant did not deny the accuracy of Dolie implicating him in the recordings that were introduced at trial. Defendant's argument presents two different but interrelated questions: did the trial court err at the time it denied defendant's request to introduce the subject recording; and did the State's discussion of defendant's lack of a denial during the closing argument deny him a fair trial.

¶ 54    Defendant acknowledges that the recording in which he seemingly denied killing Green constitutes inadmissible hearsay, but he argues that it should have been introduced under the doctrine of curative admissibility. Under the doctrine of curative admissibility, a party is allowed to present otherwise inadmissible evidence if it contradicts or explains prejudicial evidence presented by the other party. *People v. Manning*, 182 Ill. 2d 193, 216 (1998); *People v. Hinthorn*, 2019 IL App (4th) 160818, ¶ 71. We review a trial court's decision to prohibit the introduction of putatively curable evidence for an abuse of discretion. *Manning*, 182 Ill. 2d at 211.

¶ 55    Defendant did not raise the issue of curative admissibility in the trial court. Defendant did not mention curative admissibility with his request for admission of the recordings nor did he mention it in his posttrial motion discussing the issue. See *People v. Woods*, 214 Ill. 2d 455, 470 (2005) ("a defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review."). Defendant concedes that he did not specifically raise curative admissibility, but he claims that his argument that the recordings should have been admitted under the completeness doctrine was sufficient to preserve the issue for review.

¶ 56    The completeness doctrine is different from the curative admissibility doctrine. The completeness doctrine allows a party to introduce a full statement when the opposing party seeks to introduce a portion of the statement. *People v. Viramontes*, 2021 IL App (1st) 190665, ¶ 51. The curative admissibility doctrine allows a party to introduce separate explanatory evidence when other evidence might lead to a misleading or unwarranted conclusion. *Id.* These two doctrines are distinct legal principles that require distinct, specific objections. See *id.* at ¶ 56; *People v. Furby*, 138 Ill. 2d 434, 449 (1990); *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007) (issues not raised at trial or in a posttrial motion are not preserved for review and are forfeited).

Objections at trial on specific grounds waive all other grounds of objection. *People v. Barrios,* 114 Ill. 2d 265, 275 (1986). Recognizing that he may have forfeited the issue for review, defendant argues that his counsel was constitutionally ineffective for failing to raise the proper objection.

¶ 57    The United States Constitution guarantees criminal defendants the right to effective assistance of counsel. U.S. Const. Amend. VI (West 2020). To be entitled to relief on a claim of ineffective assistance of counsel, a defendant must show that his counsel's representation fell below an objective standard of reasonableness and that he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *People v. Scott*, 2015 IL App (1st) 131503, ¶ 27. The failure to satisfy both prongs of the *Strickland* test precludes a finding of ineffective assistance of counsel. *People v. Patterson,* 192 Ill. 2d 93, 107 (2000). We analyze claims of ineffective assistance of counsel by considering the entire record. *People v. Hommerson*, 399 Ill. App. 3d 405, 415 (2010).

¶ 58    Regardless of whether the error is reviewed for an abuse of discretion, plain error,[1] or under a claim of ineffective assistance of counsel, we find that defendant is not entitled to relief on appeal for the trial court's decision not to admit the subject recording. The State introduced three recordings in which defendant discussed a desire to prevent witnesses from sharing information with investigators. In the first phone call, defendant discussed Dolie and instructed, "tell that n*** don't say shit. If they ever catch him, don't say nothin'. What the fuck wrong with Dolie go in there tellin' these people everything [that] fucking happen detail by detail. *** Thought they [were] not gonna charge him with a banger or something *** If it weren't for him, I wouldn't be in motherfucking jail right now." In the second phone call a man said to defendant

_____

[1] Defendant does not argue on appeal that we should reach this error under the plain error doctrine.

"I heard Dolie told on you" and defendant replied, "that shit is on the streets already, huh." In the third phone call, the person asked defendant how he got booked and defendant replied "Dolie old ass, man. *** Dolie told 'em on me." When speaking in that third phone call about how he got arrested outside his girlfriend's place of employment, defendant stated "they was waiting. Dolie told [them] where she work at and everything." Defendant does not argue that these recordings were improperly admitted. Instead, defendant argues that it was error to not allow him to introduce a separate recording in which he claimed that he did not kill the person that Dolie had told investigators that he killed.

¶ 59    The recordings that the State was allowed to introduce were not admitted for the purpose of showing that defendant had never proclaimed his innocence. The recordings were admitted to show defendant's consciousness of guilt—that he did not want people talking to investigators because, inferentially, he did not want the truth to be told. The recordings also provided an explanation as to why the witnesses testified convincingly that defendant was the killer when they testified before the grand jury, but then recanted those statements when testifying at trial. The recording defendant sought to admit did not contradict or explain the evidence introduced by the State. See *Manning*, 182 Ill. 2d at 216. Further, the recordings introduced by the State did not create an unwarranted prejudicial inference against defendant. The recording that defendant argues should have been admitted was not necessary to understand the recordings admitted by the State or to fairly evaluate the veracity of the evidence.

¶ 60    The recording defendant sought to admit is a self-serving hearsay statement that the trial court was within its discretion to prohibit from introduction. Moreover, when the trial court denied defendant's request to admit the fourth recording, it explained that if the defense could show that the State was somehow misusing the other statements, it would entertain argument

about admitting the statements that defendant wanted to admit. Defendant never renewed his request to admit the fourth recording based on anything that transpired at trial. When all the recordings are viewed against one another, and under the totality of the circumstances, we cannot say that the trial court abused its discretion when it prohibited defendant from introducing the fourth recording. The outcome of the trial would not have been different had the jury heard the recording that defendant claims should have been admitted.

¶ 61    Defendant's argument really relies on what the State said about the recordings during closing argument more so than it does on the correctness of the trial court's evidentiary ruling on the recordings themselves. Defendant does not argue that the State exceeded the latitude it is provided in making a closing argument (*People v. Perry*, 224 Ill. 2d 312, 347 (2007)) when it commented about the recordings or that the prosecution otherwise engaged in prosecutorial misconduct with regard to the recordings. Defendant's argument both here and in the trial court is that it was the trial court's evidentiary ruling itself that entitles him to relief. We reject that contention. Defendant did not separately move to introduce the fourth recording upon the prosecutor making certain statements in his closing argument nor did he ask the trial court to revisit its ruling in light of the closing argument. The trial court did not abuse its discretion or otherwise commit reversible error when making the challenged evidentiary ruling.

¶ 62                    III. Refusal to Give Second-Degree Murder Instruction

¶ 63    Defendant argues that the trial court abused its discretion when it refused to instruct the jury on second-degree murder. Defendant requested an instruction on second-degree murder, arguing that there was evidence presented that would permit the jury to find that he acted under an unreasonable belief of the need for self-defense. The trial court rejected defendant's request,

finding that there was insufficient evidence to support instructing the jury on second-degree murder.

¶ 64    A defendant is entitled to have the jury fully and properly instructed on the law, including the law applicable to the defendant's theory of the case. U.S. Const. amends. VI, XIV; Ill. Const. 1970 art. I, §§ 2, 8; *People v. Jones*, 175 Ill. 2d 126, 132 (1997). To warrant a jury instruction on a defense theory, there only needs to be some evidence, however slight, to support a jury finding under that theory. *People v. Washington*, 2012 IL 110283, ¶ 43. When the trial court, after reviewing all the evidence, determines that there is insufficient evidence to justify the giving of a particular jury instruction, the proper standard of review of that decision is abuse of discretion. *People v. McDonald*, 2016 IL 118882, ¶ 42.

¶ 65    A person commits second-degree murder based on imperfect self-defense when he commits first-degree murder and, at the time of the killing, unreasonably believes his use of force is necessary to prevent imminent death or great bodily harm to himself. *People v. Reid*, 179 Ill. 2d 297, 308 (1997). Defendant argues that the evidence at trial was sufficient to support his request for a second-degree murder instruction such that the trial court abused its discretion by rejecting his request for the instruction. Defendant points to the evidence that he and Green had a dispute over territory for selling drugs. Defendant points out that there was evidence that he and Green argued, got into a physical altercation, and that the shooting occurred shortly thereafter. Defendant points out that the jury heard that he made a statement after the shooting that "it was either him or me." And defendant points out that the jury heard evidence that Green was a gang enforcer who murdered people. Defendant maintains that this evidence was sufficient to meet the threshold for the slight evidentiary burden to support his request for a second-degree murder instruction.

¶ 66    We find no abuse of discretion in the trial court's decision to reject defendant's request for an instruction on second-degree murder. The evidence of a physical altercation between defendant and Green was supplemented with evidence that defendant left the scene, put his shirt over his face, returned with a weapon, and approached Green from behind. The evidence showed that Green did not have a weapon. When Green turned around, defendant brandished a weapon and pointed the weapon at Green's face. See *People v. Cruz*, 2021 IL App (1st) 190132, ¶ 56 (brandishing a weapon can be considered an act of initial aggression). Green asked defendant if he was going to kill him, and Green put his arms up over his face to try to protect himself. The evidence showed that defendant then shot Green in the head and then shot him several more times all about his body. There was no evidence that defendant was under a threat of imminent death or great bodily harm. To the contrary, the evidence showed that when defendant left the scene, Green did not pursue him. See *People v. Huddleston*, 176 Ill. App. 3d 18, 34 (1988) (shooter not protected by self-defense when he pursues someone following a fight who has since abandoned the quarrel). When defendant returned, Green had his back to defendant. Defendant was the aggressor in the immediate confrontation that led to Green's death.

¶ 67    There was no evidence that defendant was under threat of imminent death or great bodily harm when he killed Green. Although defendant self-servingly stated that "it was either him or me," there was no evidence that defendant's statement had any basis in fact. Green was unarmed and defendant approached him from behind, got his attention, and then shot him. At trial, the defense focused primarily on the issue of identification and on the fact that the witnesses recanted their prior testimony. Of course, a defendant may be entitled to a second-degree murder instruction as an alternative theory and on the State's evidence alone (*People v. Jones*, 175 Ill. 2d 126, 132 (1997)), but we point out the defense's focus at trial only to highlight the overall lack of

evidence to support a second-degree murder instruction. The defense never asked the witnesses about any circumstances that would have provided a basis for instructing the jury on self-defense or second-degree murder. The defense was focused on attempting to show that defendant was not the shooter.

¶ 68    The evidence showed that defendant pursued Green after the initial conflict ended, acquired a gun, concealed his identity, ambushed Green from behind, shot him ten times after he raised his empty hands, and then fled to a getaway vehicle. The evidence was wholly inconsistent with self-defense or a belief that deadly force was necessary to prevent imminent death or great bodily harm to defendant. See *People v. Lewis*, 2015 IL App (1st) 122411, ¶¶ 66-67, 70. The trial court did not abuse its discretion when it rejected defendant's request for instructing the jury on second-degree murder.

¶ 69                              IV. The Jury's Fear of the Defendant

¶ 70    Defendant argues that he was denied a fair trial because multiple jurors expressed fear of defendant and his associates. Defendant contends that, after being aware of the jury's fear, the State played to its fears by arguing that the witnesses too were afraid of defendant, and by discussing how two of the potential witnesses died before trial. Defendant points out that the State provided no evidence that he had anything to do with the witnesses' deaths, but that the State speculated about his involvement to unfairly cast him in a negative light. Defendant argues that the State's exploitation of the jurors' fear during its closing argument denied him a fair trial.

¶ 71    Defendant acknowledges that he did not object to these portions of the State's closing argument at trial and did not raise the issue or the particular comments in a posttrial motion. Defendant forfeited this claim for appeal because he failed to object during trial or raise the issues in a posttrial motion. See *Piatkowski*, 225 Ill. 2d at 564 (issues not raised at trial or in a

posttrial motion are not preserved for review and are forfeited). Defendant, however, asks us to reach the issue under plain error review.

¶ 72     Under plain error review, we will grant relief to a defendant on otherwise-forfeited issues in either of two circumstances: (1) if the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant or (2) if the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 178–79 (2005). The plain error doctrine is not a general savings clause preserving all errors affecting substantial rights whether or not they have been brought to the attention of the trial court. *People v. Gray*, 215 Ill. App. 3d 1039, 1050 (1991). Rather, it is a narrow and limited exception to the general waiver rule and its purpose is to protect the rights of the defendant and the integrity and reputation of the judicial process. *Herron*, 215 Ill. 2d at 177. Defendant argues that the evidence was closely balanced and that the error threatened to tip the scales against him.

¶ 73     Defendant points to the several instances in which the jurors' fears were an issue at trial. Before the trial began, one of the jurors was having a panic attack and indicated to the court that he would not be able to sit as a juror on the case because of the nature of the case, the gang involvement, and because the defendant now knew the juror's name. The juror recounted that other people in the jury room had expressed that they wished they were only referred to as a number instead of by name, because now the defendant would know who they are. Another juror indicated that she recognized someone in the gallery on the first day of trial. The juror was brought into chambers and indicated that she was "a little scared" by the idea that the jury could convict the defendant and that the person she knew in the gallery could recognize her. The

courtroom deputy also reported that jurors expressed that they were uneasy about their names being used in open court because anyone could just Google their names.

¶ 74    Defendant's argument is that, with all these indications of the jury's fear as a backdrop, he was denied a fair trial when the State played to these fears during its closing argument. Prosecutors are given wide latitude in closing arguments. *Perry*, 224 Ill. 2d at 347. The State may comment on the evidence and any fair, reasonable inferences it yields. *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 38. Rather than focus on selected remarks or phrases, a reviewing court must consider the prosecutor's comments in the context in which they were made and the overall context of the closing arguments made by both parties. *People v. Ramsey*, 239 Ill. 2d 342, 441 (2010). In reviewing comments made at closing arguments, we ask whether the comments engender substantial prejudice against a defendant such that it is impossible to say whether a verdict of guilt resulted from them. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007).

¶ 75    In this case, both of the jurors that expressed specific fears were excused long before the comments made by prosecutors during closing arguments. The first juror, who was excused before the trial started, indicated that he did not share his fears about the gang-related nature of the case with anyone else on the jury. The second juror confirmed that the jury did not hear anything about why the first juror was excused and stated that he just "kind of walked out. I don't know what happened to him." The second juror was nervous about being recognized by a former coworker in the courtroom gallery. The trial judge asked the juror if anyone in the jury room was saying anything to make her think those things and the juror responded in the negative and stated that "this is me putting scenarios in my head." The second juror told the court that she did not say anything to the other jurors about her concerns or what was going on with her, and the trial court excused this juror with agreement from both the State and the defense after one

day of trial. A couple other jurors asked the courtroom deputy about their names being used in open court, but there is no indication that the jurors' concerns persisted beyond those simple inquiries and there is no indication that those jurors could not be fair adjudicators of the facts based on their questions. Defendant did not object to continuing with the jury as constructed after the court dealt with the individual jurors' concerns and excused the subject jurors.

¶ 76    In its closing argument, the State discussed the fact that the witnesses were no longer cooperative once they were in the same room as defendant and implied that they were recanting their prior testimony because they were scared of defendant. This line of comment, however, was fair based on the evidence and on the circumstances of the witnesses' testimony. Dolie and Broomfield in particular gave compelling statements of defendant's guilt to investigators and to a grand jury. After Dolie and Broomfield provided those statements, there were phone call recordings in which defendant was instructing from jail that cooperating witnesses be told not to say anything to investigators, to not repeat their assertions of his guilt. For example, defendant stated about Dolie, "tell that n*** don't say shit. If they ever catch him, don't say nothin'. What the fuck wrong with Dolie go in there tellin' these people everything [that] fucking happen detail by detail." Broomfield testified to the grand jury that he did not originally cooperate with investigators because he was scared that defendant might kill him, but that he felt better about testifying before the grand jury since defendant was incarcerated at that time. Dolie told detectives when he was arrested with a gun that he had the gun because he feared retaliation stemming from the events leading to this case. When the trial began and the witnesses were seated in front of defendant, the witnesses told a completely different story to the jury than they told to investigators and the grand jury. The State's comments were based on the evidence and

reasonable inferences therefrom and did not result in unfair prejudice against defendant. See *People v. Green*, 2017 IL App (1st) 152513, ¶¶ 85-90.

¶ 77    The State also pointed out that two other people mentioned during trial who might have been present at the shooting and seen it occur were now deceased. Defendant argues that the State improperly insinuated that the jury should ponder whether defendant might have been involved in the deaths of those people without providing evidence. However, the defense's trial strategy was to argue that the detectives had tunnel vision in this case, and the defense pointed out that there were eyewitnesses to the shooting who were not called to testify. The defense was insinuating that the State was withholding information from the jury. Defendant invited some discussion of this issue. *People v. Evans*, 209 Ill. 2d 194, 225 (2004). The State was entitled to point out the reason that the witnesses were not present at trial.

¶ 78    The prosecutor discussed one of the phone calls defendant made from jail along with the death of one of the witnesses and stated, "that is defendant trying to make sure that the witnesses against him kept quiet." The statement, in context, can be fairly interpreted to be a comment that the overall content of the phone call was defendant trying to keep the witnesses quiet, rather than that the witness's death was defendant trying to keep the witness quiet. The comment cannot be viewed in isolation. See *Ramsey*, 239 Ill. 2d at 441. Of course, it is improper for the State to argue assumptions or facts not based upon evidence or make comments with the sole effect of inflaming the passion or arousing the prejudice of the jury against the defendant. *People v. Smith*, 141 Ill. 2d 40, 60 (1990). However, when looking at the statements within the entire context of the closing argument and the circumstances of the case, we cannot say the State's comments about the witnesses' deaths unfairly prejudiced defendant or denied him a fair trial such that he is entitled to relief on appeal under plain error review.

¶ 79                                CONCLUSION

¶ 80    Accordingly, we affirm.

¶ 81    Affirmed.